IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ROCK HILL DIVISION

| | |
|---|---|
| SHANNON CHARLES, ) | Civil Action No. 04-0838-CMC-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| BEAUTY SYSTEMS GROUP, INC., ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant. ) | |
| ) | |

Plaintiff, Shannon Charles ("Charles") filed this action on March 17, 2004. Defendant is Beauty Systems Group, Inc. ("BSG"). Charles alleges that BSG discriminated against her in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA").[1] On November 2, 2004, BSG filed a motion for summary judgment. Charles filed a memorandum in opposition on November 17, 2004. BSG filed a reply on November 24, 2004.

SUMMARY JUDGMENT STANDARD

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension

---

[1] Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g). Because this is a dispositive motion, this report and recommendation is entered for review by the court.

Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 488 U.S. at 248-48).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits, see Fed. R. Civ. P. 56(e), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex

Corp., supra.  Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7, cert. denied, 493 U.S. 825 (1989).  Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 80 F.3d 954 (4th Cir. 1996).

## FACTS

1. A predecessor to BSG, Carolina Salon Services, hired Charles on September 6, 1989, as a warehouse employee. Complaint, Para. 7; Plaintiff's Dep. 11.  In 1994 or 1995, Charles began working as a salesperson.  Plaintiff's Dep. 14.

2. In 1998, Charles gave birth to a child prematurely and the child passed away.  Charles sought medical help for her psychiatric well being.  She was prescribed "nerve pills" and antidepressants.  Plaintiff's Dep. 125.

3. In 2001, Carolina Salon Services became a part of BSG, and Charles became a sales employee of BSG.  Plaintiff's Dep. 12-13, 21.

4. BSG is in the business of marketing and selling beauty products, such as those used in hair salons.

5. Charles was responsible for visiting and servicing about 150 customers in and around York County, South Carolina.  This involved Charles driving approximately 2,000 miles every

3

      six weeks. She did not have any significant performance problems during her time as a BSG employee. Plaintiff's Dep. 16, 18, 123-124.

6. From approximately January 2002 until her termination, Joe Wagner ("Wagner") was Charles' supervisor. Complaint, Para. 7; Plaintiff's Dep. 22.

7. In September 2002, Charles attended a company meeting in Charlotte, North Carolina. At the meeting, Plaintiff rode around the lobby of the hotel on a motorized scooter (that another sales representative was trying to promote). Wagner and his supervisor, Gary Graves ("Graves"), saw Charles riding the scooter. Graves noted this unusual behavior and asked Charles if she had a problem for which she needed help. Charles thought Graves was asking her if she had a drug problem, which she denied. Charles offered to take a drug test, but Graves and Wagner declined the offer. Charles was not reprimanded or disciplined for the incident. Plaintiff's Dep. 69-73.

8. In November 2002, Charles attended a sales show with other BSG employees in Winston-Salem, North Carolina. She arrived at the hotel at about 3:00 a.m. after attending a party in Rock Hill, South Carolina where she consumed alcohol filled Jell-O shooters and then rested before proceeding to Winston-Salem. After a few hours sleep at the hotel, Charles and her roommate at the show, BSG employee Tiffany Stinnett ("Stinnett"), began working the show at 7:00 a.m. Charles worked until 7:00 p.m and decided to order room service rather than go to dinner with colleagues. She ate dinner and went to sleep. A few hours later, she awoke to shaking by Stinnett. Wagner and two other BSG employees were in the room. Stinnett was crying and asking Charles if she was alive. Stinnett had been

      banging on the door for several minutes because it was secured by the u-shaped privacy lock. When Charles did not respond, a hotel employee was summoned to remove the lock and open the door. The next morning Stinnett told Charles that Wagner wanted to talk to Charles about her behavior. Charles was worried that the incident was the subject of company gossip. She spoke with Wagner, but does not recall the details of the conversation. No disciplinary action was taken against Charles. Plaintiff's Dep. 91-96, 98-99, 103-105.

9. On August 4, 2004, Charles attended a sales meeting. During the meeting, Wagner requested that Charles leave the room after she made an inappropriate comment. Plaintiff's Dep. 41, 55-56.

10. After the meeting, Wagner met with Charles and asked her if she was on any medication. She told Wagner that her prescribed medication had worn off and she needed more medication. Charles claims that Wagner accused her of being under the influence of illegal drugs based on her erratic behavior during the meeting. Wagner gave Charles a verbal warning for her behavior. Plaintiff's Dep. 44-47.

11. On August 9, 2003, Charles went to the emergency department at Piedmont Medical Center because she had swelling in her lower abdomen. She telephoned Wagner to advise him of her medical problem. She was treated, prescribed medication for pain, and released her to the care of her own physician. Plaintiff's Dep. 147, 156-157. On August 11, 2003, Charles was treated by Dr. McClellan, her physician. Dr. McClellan told Charles she had

an ovarian cyst that had ruptured and was dissolving. He prescribed additional pain medication. Plaintiff's Dep. 161-163.

12. On August 13, 2003, Wagner telephoned Charles and instructed her to go to Lab Corp to submit a sample for a drug test. Charles told Wagner she was unable to drive because she was taking pain medication prescribed for her ruptured cyst. Wagner was able to get a neighbor to drive her to the testing site. Plaintiff's Dep. 163-164, 168.

13. The sample was analyzed by Dr. John Womack, M.D., of Employee Information Systems (now known as First Advantage Corporation) in Lakewood, Colorado. Dr. Womack determined that the sample tested positive for two types of benzodiazepines (a-OH-alprazolam and oxazepam). Plaintiff's Dep. Ex. 13; Defendant's Motion for Summary Judgment, Ex. C.

14. After taking the drug test, Charles communicated with Dr. Womack. Charles explained that she was taking Xanax for which she had a valid prescription. Plaintiff's Dep. 169.

15. Dr. Womack opined that Xanax would cause the a-OH-alprazolam positive test, but not the positive oxazepam test. He also opined that Diazepam (Valium) would account for the positive test. See Defendant's Motion for Summary Judgment, Ex. C.

16. Dr. Womack explained to Charles that there was something else that was in her system at the time of testing, other than the Xanax. Plaintiff's Dep. 173-174.

17. Charles theorizes she was given a "mild Valium" at Piedmont Medical Center on August 9, 2003. See Plaintiff's Dep. 177-178.

18. On September 5, 2003, Charles faxed her purported medical records from her treatment at Piedmont Emergency Department on August 9, 2003. She wrote on the fax coversheet that the "nurse gave me this form and wrote in the medications I received." Plaintiff's Dep. Ex. 12.

19. The medical records faxed by Charles to Dr. Womack differ from the medical records received by Dr. Womack from the Piedmont Medical Center. Specifically, the medications on the discharge instructions only show Ultram on the hospital's records but includes "Motrin/diazepam" on the copy faxed by Charles. Additionally, the list of medications taken by Charles on her triage assessment form only include Detral LA and Elmiron on the hospital's records, but also include Xanax and Vioxx on the copy submitted by Charles. Plaintiff's Dep., Exs. 11 and 12.

20. In a letter to BSG's attorney, Dr. Womack stated that he told Charles that any changes to her medical record would have to be done on her permanent record; he could only accept original records from the medical provider; he noted that Charles told him she went to the emergency department, but no one would put her requested changes in the original record; Dr. Womack explained to Charles that unless he received documentation that a benzodiazepine was given, he would have to report the drug test as positive; he received original records from the medical provider which did not show that a benzodiazepine had been administered; and he reported the drug test as positive to BSG. Defendant's Motion for Summary Judgment, Ex. C.

21. At her deposition, Charles acknowledged that she had written in Xanax and Vioxx on the records, but stated that an unidentified nurse had added the notation concerning Motrin and Diazepam. Plaintiff's Dep. 225-230, 236-237.

22. Mickey Eyler Martin ("Martin"), the Director of Health Information Management for Piedmont Medical Center, confirmed that the official hospital records of Charles were different from the documents submitted by Charles to Dr. Womack because those records contained additional medications. Martin could not explain why there should be any difference. She explained that a change to the medical records to include additional medications administered would be very rare and would require a request for amendment. Martin Dep. 18-19, 35-36, 39-43.

23. Dr. Womack did not believe that he received a satisfactory explanation for Charles' positive test for oxazepam, and on September 11, 2003, a certified positive drug test result was sent to BSG. Defendant's Motion for Summary Judgment, Ex. C.

24. BSG personnel policies prohibit illegal drug use, including the use of prescription medications without a valid prescription. Charles was aware of these policies, understood them, and signed a form acknowledging them. Plaintiff's Dep. 243-244 and Ex. 14.

25. On September 19, 2003, Wagner informed Charles that she had been terminated from her job at BSG for the positive drug test. Plaintiff's Dep. 130, 176.

26. Charles visited her psychiatrist, Dr. Hayne McMeekin, and faxed a note to BSG's Human Resources Department on September 24, 2003. The fax included an undated letter from Dr. McMeekin in which he wrote that Charles was taking Xanax for anxiety and opined that

"benzodiazepines are metabolized along similar pathways and oxazepam can be a metabolic byproduct." He also opined that Charles' hormonal disturbances and reaction to severe pain from her recent ovarian cysts and severe endometriosis would increase her anxiety. Plaintiff's Opposition Memorandum, Ex. E.

## DISCUSSION

BSG argues that it is entitled to summary judgment because Charles fails to establish a prima facie case under the ADA for failure to accommodate or for discrimination based on disability. In her memorandum in opposition to summary judgment, Charles withdrew her second cause of action (discrimination based on disability). Plaintiff's Opposition Memorandum at 1. Thus, Charles' only remaining claim is her first cause of action for failure to accommodate.

Charles alleges that BSG failed to accommodate her disability. She claims that after BSG accused her of using illegal drugs, she provided evidence of her disability and the need to take prescribed medications. Charles contends that rather than engaging in the interactive process and accommodating her need to take prescription medication, BSG terminated her. BSG argues that Charles fails to establish her prima facie case under the ADA because she fails to show that she is a qualified individual with a disability and because she never asked for any accommodation.

Congress passed the ADA "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). The Act provides in part:

> No covered entity[2] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  According to the Act the term "discriminate" includes:

> denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C. § 12112(b)(5)(B).  The Act further defines "reasonable accommodation" to include:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position. . . and similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B).

A plaintiff must establish four elements by a preponderance of the evidence in order to make out a prima facie case for failure to accommodate a disability under the ADA: (1) he was an individual who had a disability within the meaning of the statute; (2) his employer had notice of his disability; (3) with reasonable accommodation he could perform the essential functions of his position; and (4) his employer refused to make such accommodations.  See Rhoads v. F.D.I.C., 257 F.3d 373, 387 n. 11 (4th Cir.2001).

Charles fails to establish a prima facie case for failure to accommodate a disability under the ADA because she fails to show that she had a "disability" under the ADA and she fails to show

---

[2]Defendant has not argued that it is not a covered entity.

that BSG had notice of her disability. Further, she fails to show that she requested any reasonable accommodation.

    A.    Disability

The ADA defines a "disability," as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). The determination of whether an individual is disabled is an individualized inquiry, particular to the facts of each case. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999). The question of whether a plaintiff meets the definition of disabled "is a question of law for the court, not a question of fact for the jury." Hooven-Lewis v. Caldera, 249 F.3d 259, 268 (4th Cir.2001).

Charles contends that she has a disability under the ADA because she has presented evidence that she suffers from the mental impairments of Post Traumatic Stress Disorder and Mild Affective Disorder which were diagnosed by her psychiatrist. She argues that her disability substantially limits the major life activity of breathing because without proper medication she suffers from panic attacks, which she describes as a near death experience that causes her to lose her breath. She also claims that she never gets a good night's sleep.

Charles fails to show that she has a disability as defined under the ADA. The mere fact that Charles has been diagnosed with a syndrome or disease and treated by health care professionals may be sufficient to establish a mental or physical impairment, but is not sufficient to establish that her impairment substantially limits one or more of her major life activities. See EEOC v. Sara Lee Corp., 237 F.3d 349, 352-53 (4th Cir. 2001). She fails to show that her impairment substantially

limits any major life activity. The Supreme Court stated in <u>Toyota Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184 (2002), that the "substantially limits" requirement indicates that an impairment must interfere with a major life activity "'considerabl[y]' or 'to a large degree.' " <u>Toyota</u>, 534 at 691. Further, an "impairment's impact must also be permanent or long-term." <u>Id.</u> Although she alleges that her impairment affects her ability to breath and sleep, she fails to show that her impairment interferes with any major life activity considerably or to a large degree.

Additionally, Charles fails to show that she has a disability because she admits her condition can be controlled when she takes her medication. <u>See</u> Plaintiff's Opposition Memorandum at 2 and 7. In evaluating whether an individual is substantially limited in a major life activity, courts are to consider mitigating measures, such as medication, and their positive and negative impact on the activity. <u>See</u> <u>Sutton v. United Airlines</u>, 527 U.S. at 491; <u>Murphy v. United Parcel Serv., Inc.</u>, 527 U.S. 516, 521 (1999) (plaintiff not substantially limited in any major life activity because high blood pressure was completely controllable with medication); <u>see also</u> <u>Tangires v. Johns Hopkins Hosp.</u>, 79 F.Supp.2d 587, 595 (D.Md.2000) (finding that where asthma is "correctable by medicine" it does not substantially limit a major life activity). Charles testified that she had not had a panic attack since November 2002. Plaintiff Dep. 126. Charles also opined that her anxiety disorder did not affect her performance of her job. Plaintiff's Dep. 134-135.

    B.    <u>Notice of Disability</u>

BSG argues that Charles never notified BSG of any disability during her employment and it did not have knowledge of a disability because Charles was not diagnosed with an anxiety disorder until several months after her termination. Charles contends that her supervisors knew

or should have known she had a mental disability because she told Graves she was taking prescribed medication when he accused her of "having a problem" and her direct supervisor observed her having panic attacks on several occasions. She also argues that although she did not provide a label for her disability to her supervisors during her employment, she provided BSG with medical evidence of a disability immediately after her termination. Plaintiff's Memorandum in Opposition to Summary Judgment at 8.

Charles fails to show that BSG had knowledge of any disability prior to her termination. Charles testified that she did not know her clinical diagnosis until this lawsuit began and that her physician prescribed medications to keep her "grounded at all times." She never asked her physician what her condition was until after this action began. Plaintiff's Dep. 135-136. Charles merely stated she perceived that Wagner knew she was taking Xanax because of the loss of her daughter. She thought Wagner should have known about her impairment because she thought previous managers had knowledge of her impairment and she thought that there was information in her personnel file about her impairment. Plaintiff's Dep. 140. She admitted she did not tell Wagner that she was having panic attacks. See Plaintiff's Dep. 144-145.

### C.     Accommodation

Charles appears to argue that BSG should have accommodated her disability by not terminating her. She claims that after her termination she provided BSG with medical evidence of her mental disability, her need to take prescribed medication, and the possibility that her prescribed medications could cause the positive drug test result. BSG argues that even if Charles had a disability and it had knowledge of the disability, Charles' claim fails because disregarding the

13

results of a drug test, especially when Plaintiff altered records relating to it, could never be a reasonable accommodation.

Charles has not shown that BSG failed to make a reasonable accommodation because she has not shown that she ever requested an accommodation. The burden of requesting the accommodation is on the employee. Gantt v. Wilson Sporting Goods, 143 F.3d 1042, 1046 (6th Cir.1998). At her deposition, Charles was asked if she had requested any kind of accommodation, special consideration, or special job adjustments because of her panic attack or anxiety condition. In response, Charles answered "no". Plaintiff's Dep. 145-146.

## CONCLUSION

Based on review of the record, it is recommended that Defendant's motion for summary judgment (Doc. 14) be granted.

                                        Respectfully submitted,

                                        s/Joseph R. McCrorey
                                        United States Magistrate Judge

March 31, 2005

Columbia, South Carolina